The Fourth District Appellate Court of the State of Illinois has reconvened. The Honorable Thomas M. Harris presiding. Good morning. We're here for case number 4-23-0761. Melissa Benard v. Illinois Department of Children & Family Services et al. Could we have appearances first for the appellant? Attorney Louis Melo for the appellant, Melissa Benard. Thank you. Assistant Attorney General Laurel Wunder for the Appellate Department of Children & Family Services. Thank you. Mr. Melo, you may proceed. Good morning, Your Honors, and good morning, Counsel. May it please the Court. The facts of this case are deceptively simple. In the afternoon of June 13th of 2022, while the foster parent my client was working, a toddler by the name of Riley, was in a living room being watched by her grandmother, sitting a few feet away from the toddler, when the toddler sees a birdhouse that had been placed earlier on top of the entertainment center in the living room by the other grandparent, when the toddler unexpectedly grabs the wooden birdhouse and tries to run with it, but falls with the birdhouse and lands in such a way that the toddler sustains cuts to her face from the sharp edges of the decorative wooden flower adorning the birdhouse. First aid is promptly administered to the toddler and she is immediately taken to the local hospital where her facial cuts are stitched up and the toddler is discharged. For this incident, the toddler's foster mother and aunt, Melissa Vinard, my client, is indicated for Allegation 61, cuts, bruises, welts, abrasions, and oral injuries. The stated basis for that indication is as follows, quote, Riley has sustained three different facial injuries in a five-month period. Multiple professionals have noted Ms. Vinard's lack of child development knowledge and questioned why supervision was not increased after the first and second incidents. There are no diagnosed medical or development concerns that would attribute Riley's injuries. This PSA further denotes a distinct pattern or chronicity of similar incidents and the fact that all three incidents were severe and will cause scarring and or deformity, close quote. Melissa sought to have the indication expunged, but the administrative law judge below denied her request to expunge the indicator report, reasoning that Melissa subjected the toddler to an environment where the toddler sustained cuts within the definition of which Melissa subjected the toddler to an environment where there was a likelihood that the toddler would sustain her injuries proposed by the administrative law judge is an amalgamation of assertions that, one, the birdhouse itself was an obvious hazard, two, that the grandmother charged with watching the toddler was unsuitable, three, that the toddler required a higher level of supervision because the toddler had a proclivity for getting into accidents, coupled with Melissa's opinion that this toddler had problems walking, and four, that Melissa failed to place the birdhouse out of the reach of the toddler. The administrative law judge's assertion that the toddler had a proclivity for getting into accidents appears to be rooted in the occurrence of two earlier but separate incidents. The first of these incidents happened in January 9, 2022, when the toddler reportedly fell onto a nail protruding from an end table at the grandparent's home that caused a cut to the toddler's head and required stitches. The second incident involved a dog biting her in February 2022. Melissa, my client, the appellant, was not present during any of those earlier incidents. Could I ask you a follow-up on both of those incidents? Yeah. With respect to the first fall on the table, is there anything in the record to suggest that your client had any knowledge about the condition of the table prior to the incident? There's nothing in the record to suggest that she had any knowledge of the table. In fact, I believe that the grandparents weren't even aware that the nail was in the table. Of course, they took immediate steps and the record does show that they removed that table from that environment after that incident. And then a similar question on the second incident where your client was not present with the dog bite, that there was no prior history of the dog biting anybody. Is that fair from the record? That is correct. This was the first time that the dog had bitten anybody. In fact, they weren't, nobody was aware that that had ever happened again. I think this was an unfortunate circumstance where the child went up to the dog and startled the dog. The dog, otherwise, was pretty, from what I could tell from the record, was not, was docile and really was not the kind of dog that would bite. Furthermore, in that case also, they took immediate steps after that to put him in a separate room. And is there any evidence in the record about DCFS recommending any change in the supervisor or the level of supervision or anything as a result of those two occurrences? Yes, I couldn't find anything in the record anywhere that would suggest that they approached my client about changing supervisors. I can, a couple of things with respect to the first incident, there was an investigation that was unfounded. And so there was really no steps taken with regards to changing any supervisor or anything in the unfounding essentially established. And there was really no credible evidence of neglect in that case. And on the second incident, they were aware of it. I don't believe an investigation would have ever commenced, but at no time was my client admonished or advised to seek alternative supervision for the foster child in her care, her niece. So I don't know if that responds to your question. It does, thank you. And we do challenge some of the key factual findings of the administrative law judge. Certainly. Excuse me, before we move on, going back to just somewhat of a follow-up on Justice Doherty's questions, would I be correct from the record that DCFS did inspect Lynn's home and approve that before the injury related to the table? And as to the first incident, that would be my understanding that that is essentially protocol anyhow for DCFS is to inspect a home before they would approve it for any kind of placement. And at that time, the child was placed in that home. They eventually moved. So that would have been, at minimum, that would have been protocol. Not, I believe in the record that would have been, I don't know if the record establishes that, but I can, I would assert that that is protocol. Thank you. You know, and we've challenged also the findings by the administrative law judge that my client knew or saw the birdhouse in the living room prior to the accident. Again, these are manifest way review things, but because they're factual, but we're disputing that. Her testimony was that she didn't know it was in the house and she did not remember seeing it in the living room. We're talking about the birdhouse that the child fell on. The administrative law judge's finding appears to be based on the DCFS investigators claim that the birdhouse would have been visible to anyone passing through that living room. And the grandmother's general kind of general statement that it was visible. The problem is that the investigator was not present when this accident happened and seems to be reconstructing what might've been the case with the birdhouse. The investigator is unable to account for such things as what direction the to gather. There is a bright flower on this birdhouse, but we don't know whether it was facing inward or outward. We also don't know whether at the time that my client walked to the living room, whether it was obstructed in any way or concealed in any way. So the investigator really can't, couldn't really provide that information. We're also disputing that the toddler's grandmother was unsuitable for the task of watching this perfectly normal toddler. Um, her lack of cat-like reflexes and not having the speed of a cheetah did not render the grandmother unsuitable. Our courts have noted that toddlers are hard to keep up with no matter what a parent's physical prowess may be. And even the young teenage mother in the Slater case couldn't muster the speed and agility to prevent her toddler from injuring herself. Was the grandmother approved by the department as a caretaker for this child? So I don't know that she had a good housekeeping seal of approval in the formal sense, but I will say two things. First of all, um, the original placement was in her home. So, so they would have had to do background checks and all those things. And I believe the record does establish that they did do background checks. And so she was approved, uh, both as a placement initially, uh, until the, you know, the son moved back in and, uh, uh, they were aware that she was watching this child. And, um, I believe the record does suggest that there was at least tacit approval on the part of, of the department that she, uh, she could be a caretaker and would be entrusted with the care of this, this, uh, this child. So they were well aware that she was, uh, she was caring for their child and that, um, uh, so on the, and, and on the two previous occasions, and by the way, with respect to the two previous occasions, of course, they were aware of all these things as well. Um, and they didn't take any, any action to this, you know, to tell her, uh, don't use grandma anymore. Um, and, uh, so I, I think that's significant. And I think that the fact that they took remedial steps really informed my client, Ms. Melissa, that these were, these were responsible people who would do the right things and, and, and certainly wanted to do the right things. Nobody wanted this child to be hurt. So I don't believe that, uh, under the circumstances, given their reaction or lack thereof, that the grandmother was unsuitable. And there was no, no indicate, no indications of these, um, uh, this grandmother or, uh, in the past. Um, and there was no indication in the previous instances that she could anticipate or didn't anticipate that there will be injuries. So I'm sorry to finish what you are going to say, but I do have something to ask. Yeah. I was just saying to the extent that grandma was regarded as sole caretaker for those two previous occasions, there was no evidence presented that either accident could have been anticipated or that the grandma was neglectful. As I indicated, there was no, no, uh, it was unfounded on the first instance. And the second that they didn't even bother to look into it, but you have a question now. Well, I'd like for you to comment on one of the of the birdhouse was tantamount to ignoring knives left within a child's reach close quote. So there are basically two aspects of that. One, uh, uh, it assumes that your client was aware of the presence of the, uh, the birdhouse. And I think you've already commented on, on that aspect, but the, uh, uh, comparison between the, uh, the dangerous, uh, nature of the birdhouse as compared to, um, knives, uh, uh, here, can you comment on that? Well, so, um, my, my comment is essentially that, well, as I indicated earlier, she, she didn't see it. So, I mean, it's sort of the, the argument, if a tree falls in the forest, uh, you know, did it fall? Uh, I think these investments, the position that every tree is should, ought to be failed, but that apart from that, I think that, um, the, the circuit judge, and I know we're not reviewing the circuit judge per se, but the circuit judge, uh, disagree with that assessment and, and, and came down saying, no, I don't think that there was tantamount to steak knives. Uh, so I, I, I, I disagree with that characterization. I, um, we don't, we don't think that, um, we're basically disputing the determination that the birdhouse posed an obvious hazard or was itself intrinsically dangerous. Uh, the likelihood of harm to the minor was remote, latent, and speculative, and no reasonable character could have anticipated a series of, of actions that led to this Tyler's injuries. It's apparent, it's apparent that the department and the administrative law judge assess the risk of that birdhouse, uh, that the birdhouse posed really based on hindsight and, and the result of injury to the toddler. This method, um, is not how our courts have historically gauged the foreseeability of injury and duty. Our Supreme court Lance versus senior observed that quote, after the event hindsight, uh, makes every occurrence foreseeable close quote council. Are those from a really a different area of law, those cases or other cases within, uh, the rubric of parental responsibility or, uh, the department's rulemaking that would establish the same proposition. Right. So if we're comparing apples to apples are trying to compare apples to apples. Uh, and I don't want to completely discount those other areas of law because I think they do inform us, but in context foreseeability, but I've cited in my brief, uh, a case of slider versus department children, family services, which I maintain is, is except for the fact that, uh, it was the mother who was the indicated rather than, uh, who was present during the incident. Um, uh, basically from what I can tell is essentially on all fours with respect to the, certainly the factual aspects of it. And as, as you're aware, in that case, uh, enslaved, the young mother is working in a, in a, on a school project at home, uh, grandmother's there, but she's not the one watching the kids. So that, that's a little different. Uh, and she basically leaves the sharp pencils. I believe, I believe on, on the table or table somewhere. And the toddler is able to easily grab one of those sharp pencils, like the toddler in our case and runs and falls with the sharp pencil, which pierces that Slater child's neck, uh, and punctures that the lining of that child's lungs. This required actual surgical intervention and a stay at the hospital. This is not a superficial injury, uh, which I think we could somewhat characterize the injuries in our case. Um, they used a lower standard of proof. And, uh, at the time they, uh, there was a higher standard with the blatant disregard, but that was not in the rules at that time. They used the lower standard of proof in that time. And they rejected the department's conclusion that the young mom, that this young mother had neglected her young child. Uh, uh, more importantly, it's established that it is not the injury that dictates whether there was neglect or not. So, uh, I believe that department ignored that particular, uh, that Slater case. So yes, there, that would be the case that I would, I would point to, or to in that direction. Um, that's, so, uh, moving on, I, I would, um, also note that, um, Melissa, it was not Melissa's responsibility to monitor this and safeguard the toddler from potentially dangerous things that could be found in every place that toddler might be taken by another responsible adult entrusted with this toddler's care. Every case cited, including the Strode case that's going to be mentioned, some consideration has to be given to the immediate presence of a party supervising a child, even if the object appears to be innocuous. In other words, it was the presence of the grandmother as a responsible adult that was the safeguard against the toddler hurting herself. No amount of child. Does the record get a little blurry on that? Because I think that the department's position is mom's routine was to come out, uh, at about one o'clock for lunch into the living room. I don't think there's a dispute that she was in the living room after the birdhouse was there before the incident. Aren't those issues a little blurred here as to whether, uh, this is purely delegated to a supervisor? So, um, well, so this is, uh, I, I don't believe that. But first of all, the accident did not not occur while she was true with the child. And I, and I, I kind of hesitate to mention this, but this, this is a new age of remote work. Uh, this court must also proceed with caution about by not unwittingly imposing higher obligations on those who work at home than on those who work out of the home. What may seem like a neutral decision, like an ambiguous decision here is more likely to affect mothers. And it discounts the level of distraction, um, that, that work can have on an adult. So the grandmother was the one charged with watching this child. That was the deal. And she would, and my client was working from home. Uh, you know, what I, what I'm saying is that when you're working from home, that, that really doesn't entirely ship back to you just because you come out and grab a bite to eat and have, you know, 10 or 15 minutes with your child. Um, so I don't believe, and it's, it, it, child was not injured. Nothing bad happened while, while she was on break. We know that, uh, children do get hurt at schools and daycares and that parents may have temporary interaction with those environments, but it would seem absurd that each time they, they are in those environments, no matter how fleeting they have a chance to observe a potential hazard, they would be expected to take immediate action to remove the perceived hazard. I just think that that it creates a real slippery slope in terms of the expectations for working parents who are trying to work and may, may have to drop off some, uh, you know, some diapers or may have to pick, you know, may have, have a little lunch with the kid. I don't think that changes who the responsibility, who ultimately is responsible for that child. Nothing happened to this child while, uh, was very briefly in my client's care. Um, uh, so that's, uh, so Melissa's duty we've, we would argue was fulfilled by ensuring that this toddler was left in the care of a responsible adult and, uh, did not extend to childproofing all the potential environments that this mire might be taken into while the, in the care of this, the grandmother. Um, you were really no amount of helicopter parenting would protect this job from all accidents. And then we are, we've argued that counsel, excuse me, you are out of time. You'll have time and rebuttal. Okay. Thank you. Ms. Wonder, you may proceed. Yeah. Okay. There's one question before the court here, which is whether the director's decision was against the manifesto of the evidence or clearly erroneous. And I'll talk about that in detail, but the bottom line here is that the director's actual findings were supported by evidence and the director applied the facts to the relevant loop standards to reach a reasonable decision. And one that can't be considered clearly erroneous based on the totality of circumstances that was presented by the evidence. Counsel, before you get started, just, could you clarify for me the, uh, the charge, the, the, the claim of the department was under number 61 and there's also references to 60. Could you kind of let us know what you think is in play in terms of the standards here? What, what is the target that we're, we're looking at? Well, let's start by looking at the legal standard, the, um, the legal standard, um, the indication was for allegation of harm number 61 that involves cuts, bruises or similar injuries. So one part of what you would look to for the allegation is, was that the case here that's not disputed here that there were, um, serious injuries. That's allegation number 61, but then you also have to look to the allegation of harm and whether the definition of neglect under the statute, the abused and neglected child reporting act was satisfied. And, um, the director did that part as well. Then turn to the statutory standard, the statutory standard here looked to, um, an injurious environment type of neglect, which involves whether the child's environment creates a likelihood of harm and whether that results from the, uh, blatant disregard of a person's responsibilities toward a child. Then blatant disregard is also a defined term. And that in turn looks to whether there's a significant risk of harm that will be obvious to a reasonable parent or caretaker. Aren't the words just to be clear, a real significant and imminent risk of harm would be so obvious to a reasonable parent or caregiver that it's unlikely that a reasonable parent or caretaker would have exposed the child to the danger without exercising precautionary measures. So that's what we're talking about is whether that wooden birdhouse fit that definition. That is what we were talking about. And under the totality of circumstances here viewed from the vantage of a reasonable parent or caretaker, uh, the director's conclusion that a reasonable parent or caretaker, um, would have been cognizant of safety here, would have taken steps as a reasonable conclusion. And let's look at what the circumstances included. Before you do, could you identify the feature of the birdhouse, uh, that was dangerous? Um, yes. And that is part of the totality of circumstances. So the birdhouse posed an obvious hazard here based on its characteristics, that this was an object that had a design with 16 sharp points. The design itself was, um, attractive to a young child because, excuse me, this had a flower shape and was bright yellow. So despite being something that was dangerous, it presented as a toy and it was, um, at a low to the ground level in the child's, uh, within the child's easy reach. Well, the design of the birdhouse, uh, didn't, uh, prompt the child to fall on it. Uh, it was simply that was the result. You're saying the design of the birdhouse, the colors, uh, caused the child to want to pick it up. So it presented the condition from which the child eventually injured herself because she ran and tripped and fell on it. Is that right? Yes. And the reason that the birdhouse, um, you know, poses an obvious hazard is because of the risk of injury and that the injury would occur by falling. Um, when there is a child who is very young, the child is unsteady, the child is prone to falling. That all is, um, you know, is unsurprising and flows from the risk that the child being attracted to and picking up this object is going to pose. So I think those come together. If there had been a vase on, uh, the, uh, uh, tabletop that the child picked up, uh, and ran and tripped and fell on, uh, would we be dealing with the exact same thing then? We wouldn't be doing the exact same thing because I don't think that the characteristics of the birdhouse can be ignored as part of this equation. This was a big, bright, sharp, child-attracting object. Well, let's just say that the vase was bright, the child picked it up, ran, fell, the vase shatters and causes severe facial lacerations. Well, how is that any different? Um, going back to the perspective of what a reasonable parent or caretaker would do, um, if this was a vase that would something that would stand out as something that would cause an obvious injury, um, then perhaps that would be the case. So the vase needs to be moved. Uh, it can't be within the child's reach. I can speak to the birdhouse and characteristics of the birdhouse and courts recognize that neglect cases, um, are each addressed on their individual facts and circumstances. And so it is hard to generalize, but if you have a vase that's presenting several sharp, um, surfaces and that is looking like a big, bright, yellow toy that the child is going to play with, and then you have all the other circumstances that we have here, then from the perspective of a reasonable parent or caregiver, um, it may be a situation where they would have taken preventative measures. Ms. Wunder, would you agree that simply because the accident happened, it doesn't mean that the birdhouse itself was inherently dangerous? Just simply because injuries occurred, you can't make the leap, uh, that the object that, uh, physically caused the injury, uh, was inherently dangerous. Would you agree with that? I would agree with the fact that the fact that there was an injury here doesn't automatically result in negligence, but the negligence as a standard... That's not what I asked though, I'm sorry. But my question is simply, would you agree that, uh, because a child is injured, uh, as a result of impacting on an object, that that doesn't necessarily, uh, mean you can conclude the object was inherently dangerous? I would agree with that because the danger here is posed by, um, the characteristics of the object, not just that an injury occurred, but the characteristics of the object, um, that this is... The director made the comparison to knives and... Do you believe that was an apt comparison? Whether this is exactly like knives, precisely, the point remains, I didn't mean to make a pun there, that this is an object with, um, several sharp surfaces and a design that presents as a toy, that this is a large, brightly colored flower, and, um, that is something that when we look at the rest of the circumstances here, and that this was a child who, in a very recent time, had, uh, twice suffered serious injuries, recent and serious injuries, and... to the caregiver that you've indicated from those prior incidents, it can't just be that they happened, like, for instance, at school or in the care of a daycare. It would have to be somehow connected to the conduct of, uh, this individual, right? She... She wasn't there on either of those occasions, wasn't her house, neither the nail in the table, nor a dog with a biting problem, was a known fact to anybody. So, tell me how those work in the disfavor of Ms. Bernard. The plaintiff here is a person with responsibilities for the child's care of another person, right? That's... That's pretty clear under the law that we don't indicate the... the ultimate caretaker because someone else didn't exercise supervision when they had care of the child. I would add some qualifications there that the plaintiff is a person who always, as... as a foster mother, just as... as a parent, they are a person who always have responsibility for the child's welfare. Right, that's true, but we don't indicate parents when their kids get hurt at school, right? We... we make it connected. The incident has to be connected to the person you're indicating. Yes, and the question... And, in fact, you didn't indicate her. So, why are we even talking about it on these other two incidents? The other two incidents come into play here as part of the totality of circumstances that a reasonable parent or caregiver would take into account in concluding that this was an obvious hazard that required protective measures because... Okay, make it a connection. Explain to me how that has to do at all with this case. The dog bite is part of a history of very recent and very serious injuries to the child. Whether the dog bite was exactly like what happened with... How was it relevant? Or that there were some differences there. The first incident was actually... that was more similar in that it involved... Can we dispose of the dog bite? Is there any way you can convince us that has some relevance to this case? Relevance of it, and it's not... it's one piece. The relevance of the dog bite is that this is something that... this is an incident that that resulted in serious injuries to the child. But under 61, it's a chronicity of similar events. So, tell us... that's what this panel keeps going back to... how the chronicity of similar events is a birdhouse and a dog bite. Falling on a birdhouse and a dog bite. The chronicity of similar events is... and I believe that there is a pattern of chronicity here by the fact that there were two recent and serious injuries. But if I could just clarify the standard... No, similar event. Answer that question first. How is a dog bite and falling on a birdhouse a similar event? Looking at it from the perspective of something that also resulted in injuries to the child and so something that would be concerning to a reasonable parent or... But you know that's enough. You know that's not enough because that reads the word similar event out of the rule. Well, and if I may clarify the legal standard, pattern of chronicity is there... part of the allegation of harm 61 has many investigative considerations. The age of the child, the severity does look to pattern of chronicity and... That was the language that was used in the finding. This PSA further denotes a distinct pattern or chronicity of similar incidents. So that's why this court is going back to what the record is before us and asking you about the similar events. I understand 61 has a variety of factors. What's before the court is not the department's investigative finding. What's before the court is the director's decision not to expunge. That's what's being reviewed and there does not need to be, for allegation of 61, there needs to be cuts and bruises and that's satisfied here. Resulting from negligent supervision. Resulting from cuts and bruises and then looking to the neglect standard under the statute. The totality of circumstances under the statute from the perspective of a reasonable parent or caretaker. A blatant disregard of a real significant and imminent risk of harm. And the history, whether it is exactly the same or not, and one of those incidents did involve falling on an unsafe environment, excuse me, falling on a nail, an unsafe object in the child's environment. And then the fact that there was another incident after that, that is all something that a reasonable parent or caretaker is going to. At the moment, she was not, the child's not in her care and custody. I know that there's an ultimate legal responsibility, but that would be like blaming a parent for an injury that happened at daycare. This is based on, this has nothing to do with being daycare or any of the other circumstances that you can't go to the hardware store and so on. This was very based on these facts. And this is a situation where the plaintiff had the opportunity to move the board house. She came into the room. No, no, no, no, no, no. Don't move the ball. Now you were talking about the prior incidents. And my point was she was not there in the prior incidents. She was aware of the prior incidents. She was responsible for a child's care, knowing that this history of recent... Okay. So seeing as how we have no evidence that there was a table with a nail in it in the third incident, nor was there a dog present, I think we probably have that covered. So what would the prior incidents have led her to be more, to give her more reason to be has had this history is something, compared with the rest of the facts here, that is going to make a reasonable parent or caretaker particularly mindful of safety. The rest of the facts being that the birdhouse, based on its characteristics, posed an obvious risk of there's no evidence that would directly show that she knew on that short lunch break, that this birdhouse had been added to the living room, right? The director's finding there was that the birdhouse would have been plainly visible. So the birdhouse... Without knowing which way it's facing? And that's a point I wanted to address that there's some suggestion here, maybe the birdhouse was turned towards the wall. I think the suggestion was we don't know which way it was turned. The grandmother's testimony was that the birdhouse appeared bright yellow and would have stood out, suggesting that it was indeed facing outward, the flower shape. But regardless of its orientation, by its design, it remained an obvious hazard because it still had 16 sharp points in the design, such that these petals, the flower shape, would be apparent regardless of the direction that it was facing. So we have a situation here where there is a child who is prone to falling. The plaintiff has said, well, there's no special needs. But whether there were special needs or this was within a normal range of child development, the plaintiff's experience of the child was this was a child who's prone to falling. There was this history of recent fire injuries. The object itself, based on its So tell us how that squares with Slater. Slater was decided under a lower standard. Yes, Slater should not dictate the outcome here because there are two significant differences. One is the legal standard at that time. There's some, it's been referred to as a lower standard. It was not a lower standard, but a different standard. The injurious environment type of neglect that also looks to blatant disregard was not in the statute at the time. So the definition was just something else. It had to do with not receiving care, necessary care, including clothing and shelter. I know your time is up, but I just want to ask you this question. If the new standard had been in place with blatant disregard, do you think the result in Slater would have been different? I think it could well have been different. The circuit court there thought it was different. The appellate court did not have a chance to weigh in. May I briefly address the factual differences in Slater? Well, if that's a follow up to Justice Doherty's question, you may complete your answer. Two important factual differences. Slater, there was no history of recent and serious harm and prior incidents that would put, make the parent or caretaker watchful. And in that case, the mother was taking precautions about the pencils. She was keeping them close. She was looking. She was just distracted for a moment. Here, the plaintiff came into the room on her lunch hour and did not take any measures about the birdhouse, which posed an obvious danger. All right. Thank you, Mr. Milo. Rebuttal argument. Thank you. With respect to the argument of counsel, the, you know, again, Slater's established clearly that the injury doesn't, isn't tantamount to neglect. We know, and if we're going to look at the statute completely, we need to look at section three of ANCRA, Abuse, Neglect, and Child Borne Act, which is the governing statute for ANCRA. So we can't, sure we can look at the other aspects of the statute, but we also have to look at what is neglect, what is not neglect. That's section three says, quote, a child shall not be considered neglected for the sole reason that the child's parent or other person responsible for his or her welfare has left the child in the care of an adult relative for any period of time, close quote. Now that is, that's what happened here. This toddler was left in the care of the grandmother while my client was attending to her duties. Now, even if number 61, the inquiry does not stop there. The fact that the cuts may meet the criteria outlined in allegation 61 is only the first step in determining whether there's, to indicate a finding neglect. And if we go back to that statute, that section of the statute, we, that tells us that there's at least a policy suggesting that if you're leaving the child in the care of another adult, you've relinquished that responsibility to that, that particular supervisor. So I don't believe section three is meant to be read in isolation, but they're all meant to be read together. So I want to point that out. The other thing in terms of this, talking about totality circumstances, I really think we're trying to see whether there's a pattern. I just want to actually point out that at no point previously did this child actually pick something up. So there's not even that factual similarity for, with respect to that. I believe that the department clearly ignored that statutory mandate about the child being in the care of somebody else and proceeding to an indication. So... Is it the department's position that it's not contending that your client was neglectful for what happened at the moment of the incident, but for the failure to take precautions earlier? Yeah. And so I think what's happening there is they're not, now they've changed this allegation from this is a cuts, you know, cuts, bruises, wells, abrasions, allegation 61. Now they're really saying this is an environment that was injurious to the welfare of the child and you had a dangerous environment. So you're responsible now for the environment in retrospect, of course. And that's a very different assertion. It's very different to say, you know, I left the chainsaw running in the living room, you know, versus saying you actually had something to do with the child getting hurt. You know, that you knew that the child was actually going to be there and so forth. I wanted to remind the court that it is, this was a June incident and it is happenstance that the child was even in the living room playing at all in June. And so it requires somehow to, I think the assertion is that somehow, even if my client had seen the birdhouse, that she was going to assume that. Why was that a happenstance? The child lived there and had a caretaker there. Yeah, but I mean that she would be necessarily playing in the living room when she could have been playing. We didn't know where the grandmother was going to be, have the child is what I'm saying. So I think that, so I think it's an entirely different proposition when we're arguing, you know, the environment itself is dangerous. We need to know that. There's nothing in that statement of, I wouldn't call it a charge, but basically the statement that talks about the birdhouse at all. And there's nothing in that statement that talks about the environment at all. That is something that is brought to the table after the fact, frankly, through quite a bit of questioning on the part of the administrative law judge. So that was something we weren't aware of. And I think the Administrative Procedure Act, which is incorporated in the Child Welfare Act, does require us to get some reasonable notice. And I don't think we would have got, we got reasonable notice in terms of what substantively they were going to be arguing. Certainly we knew there was an Allegation 61. Certainly we knew there was an argument of panic-panicity and the possibility, but we had, there was no clue in that charge that they were going to be talking about the birdhouse specifically and that it was inherently dangerous or that the environment was dangerous. And we're entitled to, I think, that information on the Administrative Procedure Act as incorporated in the Child Welfare Act. Ms. Bernard did nothing to cause an injury to this toddler. She didn't bring the birdhouse into the place where the miter would be playing. She didn't place the entertainment center within reach of the young child. She didn't invite the child to play in the same room where the birdhouse was situated. And she wasn't- Mr. Melo, you may not see it, but you've been out of time here for a bit. I'm sorry. I just, well, we're asking, we're just asking the court to reverse the decision below. Thank you, Your Honor. Thank you. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision will be issued.